We'll call the case of Brand Marketing Group v. Intertek Testing Services. Mr. Hangley. Good morning, Your Honor. Just give the students a chance to clear the room. May I invite in-house counsel for the company to sit? You may, it's fine. While I'm not using my time, I'd like to introduce my partner Matt Hammermesh from Hangley Energy, who is with me, and Richard John, General Counsel of Intertek. Okay, gentlemen, thank you. Mr. Hangley, you may proceed. Thank you, Your Honor. I would like to reserve four minutes for rebuttal.  May it please the Court. In reviewing the briefs pertinent to today's argument, it struck me that one reading them, and one reading the opinion of the lower court, could come away with an impression that Brand Company manufactured a product that, when it got to China, was discovered not to have a regulator in it, and that this came as a big surprise to people. I think, to put things in context, I should explain, while the papers are falling down all over the place and I'm not noticing, that what actually happened was that Mr. Brand made a conscious decision, as he testified, to design a product a certain way, and that made a certain sense. He decided to put the regulator, the thing that's between the gas grill, the tank, and the grill, that little round thing, he decided to put that outboard the heater rather than inboard the heater, because it was going to be a dual-purpose heater, and you might use one of two kinds of regulators. That made a certain sense, and arguably came in the terms of the ANSI standard. However, it is also important to note that he had a skilled contractor, Recon, building the devices for him, and both of them reviewed the ANSI standards in reaching this conclusion, and finally, the engineers in China, who worked for Intertech, may or may not have reached the identical conclusion, we just don't know, because there was never any testimony adduced by plaintiffs with respect to what those people had in their minds, and this will be important during the course of this argument, having to do with both tortious liability and particularly cumulative damages. Assuming that that is the case, it appears plain as day that Intertech, like Brand and like Recon, the contractor, made a mistake, because when what was done was reviewed at two levels within the company, that is, the engineers themselves, who did the testing, and their supervisor, and both of them said that this was fine, it then reached a third level, a gentleman named Kirkheat in the company, who had actually participated in creating the standards, and what he said was that this regulator must not only be assembled as part of the manifold, the system that gets the gas from the tank or the pipe to the burner, but it must be, as the Consumer Product Safety Commission examiners put it, pre-assembled. The standard may be a little bit ambiguous, but what they had in mind was a factory-installed regulator rather than an external regulator put on by an installer, even though the installer was supposed to be a qualified installer. Mr. Angley, if I might interrupt you, you appear to me, speaking as just one member of the panel, to be making some compelling arguments that would seem to be addressed to the jury regarding culpability in this matter, and I'm not sure I'm perceiving how those arguments, compelling though they may be to the fact finder, help you on appeal. No, Your Honor, I apologize if I sound that way, because I am not attempting to deny the mistake. What I am attempting to deny is the idea that this was, as stated by the trial court, some sort of a crazy, reckless venture on Interitech's part. Well, you make an excellent point in your brief about an error of the trial court regarding the form. Apparently there was a misnomer on the form that didn't necessarily mean that they tested it to the barbecue grill. And indeed, that is the only testimony. And this had... I interrupted you, sorry. Well, I was just going to follow up by saying that that error, though it appears to me on first reading, and maybe counsel will say, disabuse me of that, but it did appear persuasive to me, but that doesn't detract from the fact that this record is replete with testimony from Kirkeith that would seem to support a level of recklessness here. And I'll go into detail about that, but I'm referring to the number of engineers fired, the recognition that there had been problems, and the fact, the candid admission, that they just didn't do the job in this case, and it wasn't an isolated incident. Well, Intertech is a big company. People make mistakes. We know that mistakes are made. And I think that's why we're going to have to look at the talent part of Mr. Kirkeith's testimony, which I think has to be read rather than rely on a summary, with all due respect, in the district judge's opinion. Because what he said, as we point out in our brief, was that they had never had a problem that got through the certification stage that he recalled before this one. But you say in most of the cases they get picked up. Correct. Well, that's not all the cases. I stand corrected. I think you are right about that. He said that the only occasion on which he had a problem with the Chinese office was not a complaint. And as I read the testimony, it appeared that the customer, in that case, the Home Depot, had created some confusing instructions or a confusing product. I'm not sure which, but Home Depot changed its product as a result of the conversations rather than discipline. Mr. Hangley, as you're proceeding, you've talked a lot about, perhaps, culpability or recklessness. Let me get to another issue, because you're running out of time here. The negligent misrepresentation argument that you make, that is your basis for requesting a new trial, essentially is that the Pennsylvania law would not recognize a claim for negligent misrepresentation as broad as the one that was submitted, in this case, to the jury. And that the claim here is broader than the specialized claim that could be brought, if I use those terms, under the Bilkright exception. Correct. And because there's a general verdict, you don't know what the basis for the jury's finding was, and therefore you're speeding a trial. Correct. In essence, that's your argument. In fact, what I'm saying with respect to the Bilkright exception is that it does not apply to this case. At all. That the Pennsylvania economic damages rule in this kind of a situation applies. And basically what we're saying is that at the time the only negligent misrepresentation was made, i.e. when that test sheet allegedly came into the hands of Mr. Grant, nothing later than that because he didn't do anything in reliance on anything later than that. When that happened, Intertec was not giving him advice. Indeed, Intertec is not a counselor. Intertec is more like an auditor than like a counselor. Intertec does tests and is an objective standard. My recollection is that you seem to argue that there were two distinct categories of misrepresentations. The first being the misrepresentations made on the website in the trade show, and the second, the misrepresentations in the data sheets. And you argue that under neither of those categories did they fall within the Bilkright exception. Correct. Apart from the fact that there are no misrepresentations in the website, if there were misrepresentations, representations made to the general public cannot support a claim under the Bilkright exception. And we've given case law in brief to that effect. With respect to the... Okay, here's a question I have. You didn't ask for any special verdict in this case. There was a general verdict form submitted. Actually, it was a special verdict form. There were no 49A particular questions on the verdict sheet. But there were not specific questions that broke down the categories of misrepresentations, were there? There were not. You didn't object to the verdict sheet that was submitted. I did not, Your Honor. So, if we find that you can't distinguish what the jury based their negligent misrepresentation finding on, isn't there at least a waiver that should be held against you? Your Honor, I've got 20 seconds left. We'll give you a little more time, if not much more. We'll deduct the time for picking up the papers. That's a point I believe that was not raised and so I believe has been waived. But if it had not been waived, I think that the case law on the point is that it is not necessary in this circuit for the party, prior to the district or its dismissal of the jury, to lodge an inconsistency objection to special verdicts rendered under Rule 49A. We have, I'll reiterate, considered this to be a special verdict because of the various breakdown of the different claims. Now, there were not specific facts. Do you find this or that or the other thing? But the inconsistent verdict claim, Your Honor, is all apart from the Bilbrad exception claim. I understand that. And finally, I know I've run out of time, punitive damages at a ratio of 15 times what could probably have been recovered whether we waived it or not. That's all going to depend on the compensatory. If the compensatory are as you say they are, you win on punitives. If they are as Mr. Lumanen says, you lose, right? No. Because it's only a 5 to 1 ratio. It's a 5 to 1 ratio, Your Honor. Is there any case law to support that a 5 to 1 ratio violates the due process? There is certainly case law coming very close to that. I have a rule on the floor. As the Supreme Court told us, I would call it curious dicta from the High Court, but that curious dicta said something to the effect that, well, single digit multipliers are going to be okay. In commercial harm cases, financial harm cases, as distinguished from personal injury cases, the case law seems to come in at a pretty consistent in this circuit between 1 and 2 to 1. We collected some cases, and I have a chart in here that breaks it down. Those are just cases where you're surveying what happened in those cases. These aren't cases that say 2 to 1 is the limit. This would be an outlier to those cases, but the cases do not expressly say that anything over 1 to 1 or anything over 1.5 or 2 to 1 is per se unconstitutional. I think that's where they're headed, but that has not yet happened. Okay. All right, Mr. Hangley, we'll go back on the Bible. Mr. Lupinen? Good morning, Your Honors. Brendan Lupinen here on behalf of Appellee Brand Marketing Group. I just want to start off this point, it was sort of touched on before, that what Intertek Testing, and this was discovered, I was trial counsel in this trial, and what was revealed to the jury was that Intertek is a legally permitted company that stands as the gatekeepers for all of our safety in our homes. All of the products in our homes. They are the last ones to say, is this safe to American safety standards or not? And what we discovered and what the jury learned about at trial, which supports the punitive damages in this case for recklessness, was that Intertek knew of the massive threat to public safety if the safety standards are not compliant with the products that they test, all the products that they test, but specifically with the heaters in this case. It's a home heater. Rick Kirkey, their very top chief engineer, told the jury that if these things are not tested correctly, they can poison people and they can blow up in people's homes. And that starts the knowledge that Intertek had of what they're dealing with here. And then Intertek understood their duty, their supreme duty, I'm not sure if there would be a higher one in our community, of protecting the public. And what they did was they sent people on the standards to develop them because they knew that their standards, and what this all comes down to at the end of the day, the test sheets that Your Honor mentioned at the very beginning, is what all these tests are based on. You can train people and you can figure they're good engineers and they're going to do the job right, but what these standards come down to at the end of the day is does this product meet A, B, C through Z? And if it does not... Didn't your client jump the gun in marketing the product, though? Did my client jump the gun in marketing the product? Yes. Because what happened in this particular case is that Intertek represents on their website, and Rick Kierke testified to this at trial, that what customers and what consumers rely upon are the test results. And what Rick Kierke testified at trial was that had these products gone out and it was merely that the label was wrong and that the marking was wrong, it easily could have been scratched out, remarked, etc. But what Intertek did in this particular case was that they said these products will find a new manufacturer as they did. And that caused Brand to not take any steps to quickly and easily fix the heaters before they were mass marketed. But Intertek had not said formally that we give you our stamp of approval, had they? Well, Your Honor, they did. But not when Brand was looking at the test sheet. And that's when he started putting the mark on, isn't it? But David Brand was a third party. And there's no testimony that David Brand ever put a mark on these heaters. Recon put a mark on the heaters. And Recon is the company that had the contract with Intertek, and Intertek never sued Recon for that. Brand was simply a third-party distributor that was relying upon the information provided by Intertek. And Recon may have jumped the gun, but that issue's gone, because Intertek chose never to sue that company. So here Brand is, gets these heaters, his company represents that they're marked and they're good to go. And he goes forward with his contract not taking any steps to quickly and easily fix these before they're mass manufactured. And they get out into people's homes where, again, they could have seriously injured people. Fortunately, they did not in this case. Okay, but you have the sale to Ace Hardware. Absolutely, Your Honor. And a few months later, after Ace Hardware begins to sell these heaters, Ace Hardware says, Whoa, hold on here. We learned that, you know, we want our money back. We paid you for these heaters that don't meet the safety standards. We want our money back. Right. Your Honor, I'm sorry, was there more to your question? Yeah. Okay. Your Honor, what the trial, what the evidence showed was this timeline, is that the heaters go to Ace and the contract's fully carried out, and they start telling them that selling the heaters is no problem. We're going to sue Intertech. We're going to sue these guys for trademark infringement. We think their product's too similar to ours. So in response to that, Ace puts a temporary freeze on selling the products. They evaluate it. Mr. Campo, the sales representative that testified at trial, said we looked at it, and then they decided to start selling the heaters again. Okay, despite knowing about this and the ongoing nature of the case, the second punch worked pretty well. It was a good one. By the way, these aren't safe. That's right, Your Honor. So Ace Harbor says, wait a minute, we want our money back. Absolutely. Ace Harbor says, take these heaters back, give us our money back. But granted, at this point in time, the testimony came out, this was a guy who was living on a shoestring budget. This is all a consequence. All right, but what exactly was the misrepresentation here? It can't be the website. Oh, no, Your Honor. You lose on that. Absolutely, Your Honor. That's just a distraction. What was it if it wasn't the website? That would be a program of fraud. This is negligent misrepresentation. We accurately make it out. It's too poor, Your Honor. First of all, the trial testimony comes out, it's outrageous. And then thereafter, Your Honor, there's continued discussions, there's email discussions. What is their misrepresentation? First of all, they lied to your client when they said what? When did they say it, what did they say? Those are admissions by a party opponent. What the testimony showed is that Ziegler and Stribal told Brandt, we can do the testing and we can do it. That company had never done it before. And if you look at the, what I'll get into if you want, the sort of just knowing reckless disregard for following the safety standards and having certain test standards. They make a sales pitch at a trade show. But it's talking to their representatives. They're telling them, hey, we can do this. Wait a minute, wait a minute. It was a sales pitch. There was no agreement. Because that's what led to the misrepresentation. Okay, but Brandt goes to Recon. Recon's the one who goes to Intertech. Absolutely. And clearly, we're going back to where is the negligent misrepresentation that gets you the jury verdict? It's the test sheets. It's the test sheets. That's what we're talking about. We're like Hong Kong, you're leading with your weak hand. It took us four minutes to get there. I apologize. So no, absolutely. And if you look at the test sheets, this discussion at the beginning, something about the test sheet, there was just a kind of misnomer. It says it right on the bottom that they tested an indoor heater to an outdoor heater standard. There's things in there that these people didn't even pick up that they're testing a home heater to an outdoor broiler standard. But is that the misrepresentation that it's the barbecue grill that they tested and fully meets the standard and absolutely did not? That's it. I mean, that's the end of the story as far as the misrepresentation is concerned. And it couldn't be any more clear-cut. All right, now on punies, what do you have to show that? What's your evidence for recklessness? The story came through in both Mr. Kirkheath's direct exam and his cross-exam combined. So I started to touch about this before. So clearly they understand this great privilege that they have that Mr. Kirkheath talked about. They know what happens if these products get out and they don't meet the safety standards. So you have that knowledge of this massive potential harm right there. So then where is the conscious disregard of that? Well, here's where it is, Your Honors. Rick Kirkheath testified that he sits on the standard committees helping develop these things. And the purpose for it is so Intertech as part of their business can make sure that their written forms, that's what it all comes down to, because if they don't, then the product's not going to be tested correctly and it poses a danger. And so they're supposed to be doing that. They call it a parallel process, but it never happened. And Rick Kirkheath talked about the fact that no matter how hard they tried, other laboratories and other engineers were always, that this had been going on as far as you can remember, coming up with their own documents, doing their best to make do with the documents that they have that are ongoing. And Mr. Kirkheath testified, these are his words, though we try to do our best to collect those and have a uniform best practices document, it never worked out to be done. It just never worked out to be done. It just doesn't sound feasible that they've never done testing right. It's a multi-billion dollar company. You're suggesting that their testing regimen was always wrong? Or is it just, in this case it was wrong. I thought this case had something to do with the fact that it was a new standard. And Kirkheath was involved with creating that standard, was he not? Well, exactly. He was sitting on the ANSI standard. But just to take it back one point, my response to you, Your Honor, would be calculated risk. And the reason I say that is because Intertech has an entire arm of their company that deals with products getting out that they don't even know about. It gets responded to them and saying, there's another product out here that doesn't meet the safety standard. And that in and of itself is an example of the fact that this happens so consistently. Oh, and I would point you to Stephen Rohl, Intertech's own expert, who happened to work there for 10 years, admitted that during his time there this was a monthly occurrence. So, Your Honor, I would say that there's these field reports which are people calling Intertech and saying, well, you know, we're not going to do that. That's their basically solution, their kind of safety net, if you want to call it that. It's not. To deal with the fact that they can never and never have been able to have uniformity of documents at this company, despite the fact that the entire company is based upon uniformity of documents. So, can you just address that? Well, I think the focus of my waiver argument was more on the 552B issue. And as far as the waiver with respect to the punitive damages argument, I mean, I don't need to argue that. I think we felt that there might be something to it, but quite honestly, in hindsight, I'm not sure if there really was. What evidence is there in the record that shows that Intertec subjectively appreciated the risk of harm to your client by following their standard testing procedures? Well, I mean, personally, I think it sort of speaks for itself, Your Honor, but they indicated that they knew that consumers rely upon their safety test results. I mean, that's, again, not to go to the website, it's that type of representation, but that shows their general understanding of that. They knew that this work was being done for one of two buyers of this product for sale in the United States, and Brand Marketing Group was one of them. So their subjective appreciation, I mean, quite honestly, I don't know if the, my feeling is that Rick Herkey testified that they knew, that they knew for a long time before this that they could never get their documents correct. And they knew what happens if they were in a very technically oriented business that it was, you know, important to be professional in how you test the product because there was general risks out there. But don't you have to show that they knew that there was a risk of harm to your client specifically involving this particular heater? Well, I think that they, I think they knew always that there was a risk of harm. I think the only process that fully follows the ANSI standard versus what they actually do is the knowledge. They know that on a regular basis, I mean, it's sort of like a Russian roulette. It's, you know, which of these people, you know, you spin the chamber and which one is not going to get tested correctly and we're going to send out a dangerous product out there. I mean, that's what this is in this particular case. And certainly they knew that if you don't test the heater correctly and Rick Kirkey testified to that, it's going to lead to poisonings and explosions and fires, et cetera. But it's starting to sound like State Farm though, right? The Supreme Court and State Farm disapproved of punitives awarded because of the harm that would befall all State Farm customers around the country. You know, I actually think that our case is easily distinguishable from State Farm because State Farm basically took it upon themselves, the council, and it was even admitted that they had corrupt portions of their opening statement where they said, this case is not about the Campbells, this case is about this ongoing scheme of State Farm to save money on premiums, et cetera. But really, what it turned out that they built their whole case on were practices that either, A, weren't illegal in the states that they used them upon, or weren't at all relevant to the actual harm that was caused to the Campbells in that case, which was basically not settling a third-party claim. They were using evidence of first-party practices, et cetera. Whereas in our case, Kirkey's testimony is exactly what happened in this case. This case is a microcosm of what happens as a result of what InterTek does. They can't ever get their standards correct, and they're letting people in other countries that, quite frankly, can't interpret the language very easily kind of come up with their own documents and come up with their own sort of test to do the best they can, and that's exactly what happens. When you allow that to happen, you get test sheets testing to the wrong product. What's your answer to the question I posed to Mr. Hadley? Do you concede that the constitutionality of the punitives award is dependent upon how we rule on the compensatory award? I would agree, Your Honor, based on the case law, that if you were to accept their argument as a flimsy argument, that the compensatories are much smaller than they actually were. If compensatory is $140,000, $5 million can't stand.  if a million is the number, then you're okay. I can say this, Your Honor, that there's more case law to support the fact that compensatory is much smaller than they actually    that there's more case law to support the fact that the much higher multiple is going to be scrutinized much more closely, and certainly the kind of takeaway is that more than a double-digit ratio really starts to push the boundaries of due process. The fact of the matter is that the compensatories in this case were so reasonable and so appropriate in the circumstances and certainly recoverable under 552B, that you don't have to do that. And so a 4.9 to get technical to 1 ratio is absolutely not, and there's no case law to indicate that that's a violation of due process of Intertech. All right, Mr. Lupinen, thank you. Thank you so much. And we'll have Mr. Hangley back on rebuttal. On the compensatory damages point, if his client had been entitled to recover the value of his claim, which he is not under 552, he would have had a profit of maybe $120,000, the difference between $450,000 sale to Ace and $320,000 of what his expert said  As it is, he gets a million dollars, plus he gets to keep the money that he owns to his clients and his clients who pay back to Ace. So he does far better. It's not reasonable compensatory damages. You've got a judgment you bought from Ace that you want  to collect from. Correct. That is correct. That's an offset to it. Okay, it's an offset. Mr. Hangley, why should we predict that the Supreme Court of Pennsylvania would create an exception to Hutchinson v. Luddy and declare that punitive damages which are not generally prohibited for negligence cases are in fact prohibited in this type of negligence case? They have never done it and I will agree with what was said in the briefs of the cases that had the benefit of briefing that there are decisions stating that the law of Pennsylvania will be the other way. I think that that is probably a question for the state courts first, but I think we need to do it. Because we certify the question, we need to predict. The right answer here is that it is wrong to let a party avoid the burden of clearly convincing evidence and do it in order. There's a lot of logic supporting that. As I understand your point there, you're saying look, there's a lot of logic supporting that.    it's    a party avoid the burden of convincing evidence and do it in order. I don't think it's right to let a party to let a party    of  evidence and do it